UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE PFIZER INC. ERISA LITIGATION                No. 04 Civ. 10071 (LTS)(HBP)

This document relates to: All Actions
--------------------------------------------------------x

### OPINION AND ORDER

APPEARANCES:

KELLER ROHRBACK L.L.P.
   By: David S. Preminger, Esq.
770 Broadway, 2d Floor
New York, NY 10003
         - and -
      Lynn Lincoln Sarko, Esq.
      T. David Copley, Esq.
      Juli E. Farris, Esq.
      Amy N.L. Hanson, Esq.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
         - and -
      Ron Kilgard, Esq.
3101 North Central Ave., Ste. 1400
Phoenix, AZ 85012

*Interim Lead Counsel for Plaintiffs*

COHEN MILSTEIN SELLERS
& TOLL, P.L.L.C.
   By: Bruce F. Rinaldi, Esq.
      Karen L. Handorf, Esq.
1100 New York Ave., N.W.
West Tower, Ste. 500
Washington, D.C. 20005

*Additional Counsel for Plaintiffs*

SIMPSON THACHER & BARTLETT LLP
By: Lynn K. Neuner, Esq.
   George S. Wang, Esq.
   Bryce A. Pashler., Esq.
425 Lexington Avenue
New York, NY 10017

DLA PIPER LLP
By: John R. Wellschlager, Esq. (*pro hac vice*)
6225 Smith Avenue
Baltimore, MD 21209
         - and-
      Michael D. Hynes, Esq.
      Rachel V. Stevens, Esq.
1251 Avenue of the Americas
New York, NY 10020

*Counsel for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

Lead Plaintiffs, who are four former employees of Pfizer Inc. ("Pfizer") and Pharmacia Corporation ("Pharmacia"), bring this putative class action against Pfizer and Pharmacia, and certain of their committees, committee members, and directors (collectively, "Defendants"), asserting claims pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), for violations of fiduciary duty.  Plaintiffs' claims arise from their participation in retirement savings plans (the "Plans") sponsored by Pfizer and Pharmacia, whose investment options included company stock funds that invested exclusively in Pfizer or Pharmacia common stock.  Plaintiffs allege that Defendants either knew or should have known that Pfizer and Pharmacia were engaging in marketing and communications activities concerning two drugs, Celebrex and Bextra, that artificially inflated the value of Pfizer and Pharmacia securities and rendered them imprudent and inappropriate investments, and that Pfizer's stock price fell after certain revelations regarding these two drugs. Plaintiffs assert that Defendants are liable to the Plans under ERISA for losses suffered by the Plans on their holdings of Pfizer and Pharmacia stock.  The Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

Defendants have moved to dismiss Plaintiffs' Consolidated Second Amended Class Action Complaint ("SAC").  Additionally, Pfizer and Pharmacia (the "Entity Defendants") have separately moved to dismiss Plaintiffs' claims as to them, on the ground that they were not fiduciaries of the Plans involved in this case.  The Court has reviewed carefully all of the parties' submissions and, for the following reasons, Defendants' motion to dismiss the SAC is granted. The Entity Defendants' separate motion to dismiss will be terminated as moot.

<u>BACKGROUND</u>

The following facts are drawn from the SAC, and are taken as true for purposes of this motion to dismiss.[1]

<u>The Parties</u>

Plaintiffs are current or former participants in defined contribution plans sponsored by Pfizer, Pharmacia, or Warner-Lambert.  The four named plaintiffs, Peter F. Muffle, Alan Berlow, David C. Harber, and Vincent Romano, are current and past participants in the Pfizer and Pharmacia plans.  (SAC ¶¶ 32-35).  The proposed class consists of all persons, other than the Defendants, who were participants in or beneficiaries of any of the relevant plans at any time between August 29, 2000 through and including December 9, 2005 (the "Class Period").  (SAC ¶¶ 9, 10.)

The SAC identifies and refers to five general groupings of Defendants.  The first group is the Entity Defendants, Pfizer and Pharmacia (the "Entity Defendants" or "Pfizer" or "Pharmacia").  (SAC ¶¶ 36, 52.)  The second group, the Director Defendants, is comprised of individuals who served on Pfizer's Board of Directors and Pharmacia's Board of Directors during the Class Period (collectively the "Director Defendants").  (SAC ¶¶ 17, 24.)  The third group, the Committee Defendants, consists of the Pfizer Plan Committee and its members, as well as the Pharmacia employee benefit plan administrative and/or investment committees and their members, during the Class Period (the "Committee Defendants").  (SAC ¶¶ 21, 26-27.)  The fourth and fifth

---

[1]     In deciding a motion to dismiss, the Court may also consider statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, analyst reports, and documents upon which Plaintiffs relied in bringing suit.  See  City of Livonia Employees' Retirement System v. Wyeth, No. 07 Civ. 10329(RJS), 2010 WL 3910265 (S.D.N.Y. Sep. 29, 2010), at *1 n. 1.

groups are denominated, respectively, the Pfizer Defendants and Pharmacia Defendants.  The

Pfizer Defendants include Pfizer, the Pfizer Director Defendants, the Pfizer Committee

Defendants, and the Pfizer Leadership Team.  (SAC ¶ 15.)  The Pharmacia Defendants include

Pharmacia, the Pharmacia Director Defendants, and the Pharmacia Committee Defendants.  (SAC

¶ 23.)

The Plans

        The investments of six ERISA-governed plans are at issue in this litigation: the

Pfizer Savings Plan ("PSP"); the Warner-Lambert Savings and Stock Plan ("W-L Plan"); the Pfizer

Savings and Investment Plan ("PSIP"); the Pharmacia & Upjohn Employees Savings Plan; the

Pharmacia Savings and Incentive Plan (f/k/a Monsanto Savings and Incentive Plan); and the

Pharmacia Savings Plan.  (SAC ¶¶ 18, 25.)  The plans were in effect at different points during the

Class Period and were ultimately merged into two plans -- the Pfizer Savings Plan and the

Pharmacia Savings Plan.[2]  (SAC ¶¶ 98, 166.)  In this Opinion, the relevant plans, as in effect from

time to time, are referred to collectively as the "Plans."

        All of the Plans are "employee pension benefit plans" within the meaning of ERISA

3(2)(A), 29 U.S.C. 1002(2)(A).  (SAC ¶ 69.)  The Plans are "eligible individual account plan[s]"

("EIAPs") as defined in Section 407(d)(3) of ERISA, 29 U.S.C. § 1107(d)(3), as well as "qualified

---

[2]     Pfizer sponsored and maintained the PSIP from the start of the Class Period in
January 2000 until it was merged into the PSP on  February 1, 2002. (SAC ¶ 82.)
On June 19, 2000, Pfizer acquired the Warner-Lambert Company
("Warner-Lambert") and took the W-L Plan, and on that same date all
Warner-Lambert common stock held in the W-L Plan was automatically exchanged
for Pfizer common stock.  (SAC ¶ 120.)  Like the PSIP, the W-L Plan was merged
into the PSP on or about February 1, 2002.  (SAC ¶ 98.)  Pharmacia sponsored and
maintained certain plans ("the Pharmacia Plans") during the Class Period prior to
Pfizer's acquisition of Pharmacia in 2003 and the subsequent merger of the
Pharmacia Plans into the Pfizer Plans.  (SAC ¶¶ 148, 166.)

cash or deferred arrangement[s]" under section 401(k) of the Internal Revenue Code.  (SAC ¶ 69.)

Each of the Plans was established and maintained through a written instrument, and each featured

investment in Pfizer and/or Pharmacia securities ("Company Stock") through participant

contributions, an employer matching component, or both.  (SAC ¶¶ 70, 71.)  During the Class

Period, a number of the Plans were not designated as employee stock ownership plans ("ESOPs").

(SAC ¶ 73.)  Even those Plans that did purport to qualify as ESOPs failed to satisfy all of the

mandatory statutory and regulatory mandates with respect to Plan design and/or operation.  (SAC

¶ 73.)  Each of the Plans, however, offered as an investment option a fund that was invested

primarily or generally in Company Stock ("Company Stock Funds").  (See SAC ¶ 13 ("Company

Stock Fund(s)" means the investment funds at issue in this case that invested primarily in

Company Stock during the Class Period).)

Allegations of Misconduct

        Plaintiffs allege that Defendants were aware, during the Class Period, that

investment in Company Stock was imprudent and that the price of Pfizer's stock was artificially

high because two of Pfizer's drugs, Celebrex and Bextra, presented cardiovascular and

gastrointestinal risks of which the market was unaware.  Plaintiffs cite a number of medical studies

conducted prior to and during the Class Period that allegedly revealed significant risks posed by

Celebrex and Bextra.  (SAC ¶¶ 286 - 423.)  Plaintiffs further allege that Defendants did not

publicly disclose the results of many of these studies until years later and that, in some instances,

Defendants deliberately concealed or presented misleading information about the data.  (See, e.g.,

id. (describing various studies conducted on Bextra and Celebrex and alleging that Defendants

failed to disclose their results).)  On December 10, 2004, the Federal Food and Drug

Administration (the "FDA"), approved a new label for Bextra with a "black box" warning

concerning cardiovascular risks for certain patients.[3]  (SAC ¶ 421.)  On December 17, 2004, the National Institutes of Health announced the premature suspension of a long term study involving Celebrex as the result of dramatic increases in cardiovascular death and stroke among patients taking Celebrex as part of the trial; as a result, Pfizer's stock price dropped by 12%.  (SAC ¶¶ 425 - 26.)  By January 24, 2005, public calls were issued to remove Celebrex and Bextra from the market.  (SAC ¶¶ 437 -38.)  On April 7, 2005, Pfizer agreed, at the FDA's urging, to insert a black box warning in Celebrex's label and publicly announced that the FDA had directed it to remove Bextra from the market.  (SAC ¶¶ 483 -85.)  Because the vast majority of the Plans' assets were invested in Company Stock, the Plans ultimately lost hundreds of millions of dollars as a result of investments by Defendants in the Company Stock and Company Stock Funds during the Class Period.  (SAC ¶ 623.)  Additionally, in connection with FBI and Department of Justice investigations, Pfizer managers pled guilty to both criminal off-label marketing and destruction of evidence relating to Bextra.  (SAC ¶ 573.)  Pfizer also paid $2.3 billion to settle civil and criminal claims involving off-label marketing of Bextra and other drugs -- $1.3 billion of which was specifically paid in relation to criminal charges for off-label promotion of Bextra.  (Id.)

Claims Asserted

Plaintiffs assert the following claims: breach by the Entity Defendants, Pfizer (Count I) and Pharmacia (Count V) of the ERISA fiduciary duties of prudence, loyalty, and the ERISA-imposed duties to monitor, communicate and investigate; breach by the Pfizer Director Defendants (Count II) and the Pharmacia Director Defendants (Count VI) of the ERISA fiduciary duty of loyalty, and the duties to monitor, communicate and investigate; by the Pfizer Committee

---

[3]   Plaintiffs assert that "the black box label is the most potent warning in the FDA's arsenal, and often has a significant negative impact on a drug's sales." (SAC ¶ 475.)

Defendants (Count III) and the Pharmacia Committee Defendants (Count VII) of the ERISA

fiduciary duties of prudence, loyalty, and the duties to communicate and investigate; and for

knowing participation on the part of the Pfizer Defendants (Count IV) and the Pharmacia

Defendants (Count VIII) in breaches of fiduciary duty.  Plaintiffs also assert claims for

co-fiduciary liability against all Defendants pursuant to ERISA § 405, 29 U.S.C. § 1105 (Counts

I-III; and Counts V-VII).

PROCEDURAL BACKGROUND

Plaintiffs filed a consolidated class action complaint in June 2006 and an amended

complaint on July 27, 2007.  Defendants filed a motion to dismiss these complaints, which motion

this Court granted in part and denied in part on March 20, 2009 ("Pfizer I Opinion").  In that

decision, the Court dismissed all claims regarding plans for employees in Puerto Rico for lack of

standing, and dismissed the "knowing participation" claims under ERISA § 502(a)(3) as to all

Defendants.  The Court allowed Plaintiffs' claims of breach of fiduciary duty to proceed.

In 2011, the Second Circuit decided In re Citigroup ERISA Litig., 662 F.3d 128 (2d

Cir. 2011), a case in which the Second Circuit, following the Third Circuit's decision in Moench v.

Robertson, 62 F.3d 553 (3d Cir. 1995), held that investments of employee benefit plan funds in

employer securities pursuant to plan provisions calling for such investments are presumptively

prudent.  The Citigroup Court further held that the presumption is to be applied at the pleading

stage, such that dismissal of a fiduciary breach complaint arising from investments in employer

securities is appropriate unless the complaint alleges facts sufficient to demonstrate abuse of

discretion by the fiduciary.  662 F.3d at 139.  Since the Citigroup decision, the Second Circuit has

issued five more decisions interpreting and applying the Moench presumption in ERISA cases:

Gearren v. McGraw-Hill Cos., 660 F.3d 605 (2d Cir. 2011); Fisher v. JP Morgan Chase & Co., 469
F. App'x 57 (2d Cir. 2012) (summary order); In re GlaxoSmithKline ERISA Litig., 494 F. App'x
172 (2d Cir. 2012); Slaymon v. SLM Corp., No. 10-4061-CV, 2012 WL 6684564 (2d Cir. Dec 26,
2012); and Taveras v. UBS AG, 708 F.3d 436 (2d Cir. 2013).  Plaintiffs have amended their
complaint in light of these legal developments.  The SAC proffers greater detail regarding
Plaintiffs' allegations as to Defendants' knowledge and concealment of facts regarding health risks
of Celebrex and Bextra, and as to the actual and potential economic impact of disclosure of those
risks; Plaintiffs also contrast Defendants' actions with respect to company stock investments for
other Pfizer benefit programs and their own individual accounts with their maintenance of the
company stock funds under the Plans.  Defendants, relying on Citigroup and its progeny, now
move to dismiss the SAC.


## DISCUSSION

In deciding a motion to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure, the Court accepts as true the non-conclusory factual allegations in the
complaint and draws all reasonable inferences in the plaintiffs favor.  Roth v. Jennings, 489 F.3d
499, 501 (2d Cir. 2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  "A pleading that
offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do."
Iqbal, 556 U.S. at 677 (internal citations omitted).  Rather, to survive a motion to dismiss, a
complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell
Atlantic v. Twombly, 550 U.S. 544, 570 (2007).  "Where a complaint pleads facts that are merely
consistent with a defendant's liability, it stops short of the line between possibility and plausibility
of entitlement to relief."  Iqbal, 556 U.S. at 677.

Duty of Prudence Claims

The Moench Presumption

ERISA provides that an individual account pension plan, such as those at issue here, is treated as an "eligible individual account plan" for relevant purposes, if it "explicitly provides for acquisition and holding of qualifying employer securities."  29 U.S.C.A. § 1107(d)(3) (West 2009).  Fiduciaries of such plans are exempt from the ERISA duties of diversification and of prudence (to the extent prudence requires diversification) with respect to the acquisition or holding of qualifying employer securities, although the duties of prudence, loyalty, exclusive benefit, and compliance with plan documents (insofar as the documents themselves are consistent with ERISA) apply in all other respects.  29 U.S.C.A. § 1104(a).  There is no dispute here that the Plans are eligible individual account plans ("EIAPs") and that the Pfizer and Pharmacia stock investments were qualifying employer securities.

In Moench, the Third Circuit held, in light of these ERISA provisions, that a presumption of prudence applies to an EIAP fiduciary's retention of investments in employer securities.  The Second Circuit, in Citigroup, adopted this presumption and held that the retention of such investments is subject to the deferential abuse of discretion standard:

> We now join our sister circuits in adopting the *Moench* presumption—and do so with respect to both EIAPs and ESOPs [plans designed to invest exclusively in employer securities]—because, as those courts have recognized, it provides the best accommodation between the competing ERISA values of protecting retirement assets and encouraging investment in employer stock.  An ESOP or EIAP fiduciary's decision to continue to offer plan participants the opportunity to invest in employer stock should therefore be reviewed for an abuse of discretion.  This presumption may be rebutted if an EIAP or ESOP fiduciary abuses his discretion in continuing to offer plan participants the opportunity to invest in employer stock.

662 F.3d at 138.

In Citigroup, plaintiffs alleged that defendants had breached their fiduciary duties under ERISA by continuing to invest assets in Citigroup stock despite knowing that such stock was an imprudent investment because of Citigroup's "ill-advised investments in the subprime-mortgage market while hiding the extent of those investments."  662 F.3d at 140.  The Second Circuit upheld the dismissal of the case, holding that the Moench presumption was properly applied at the pleading stage: "Where plaintiffs do not allege facts sufficient to establish that a plan fiduciary has abused his discretion, there is no reason not to grant a motion to dismiss."  Id. at 139.

In assessing whether the presumption applies, the Court must look first to the language of the relevant plans and consider whether the plan documents require or, at least, "strongly favor" investment in employer securities.  If so, the presumption will apply.  In re GlaxoSmithKline ERISA Litig., 494 F. App'x 172, 174 (2d Cir. 2012) (quoting Citigroup, 662 F.3d at 139-40).  In Citigroup, the plan documents provided for an investment fund "'comprised of shares of' employer stock, and authorize[d] the holding of 'cash and short-term investments' only to facilitate the 'orderly purchase' of more company stock."  662 F.3d at 139.  The Second Circuit applied the Moench presumption, finding that such language gave the fiduciary "little discretion to alter the composition of investments."  Id.  Similarly, in McGraw-Hill, the Moench presumption was applied where the relevant plan documents stated that "the Pension Investment Committee "shall determine in its sole discretion the Investment Options that shall be available under the Plan, provided that . . . the Plan shall offer (a) the 'Stock Fund' which will be invested primarily in the Common Stock of the Corporation."  Gearren v. McGraw-Hill Cos., 690 F. Supp. 2d 254, 262, 264 (S.D.N.Y. 2010) (emphasis in original), aff'd, 660 F.3d 605 (2d Cir. 2011).  In Fisher v. JP Morgan Chase & Co., the Second Circuit found that the Moench presumption applied even when a

plan did not expressly require participants to be able to purchase employer stock, because "a number of the Plan's provisions strongly favor[ed] employee investment in JP Morgan," distinguishing the case from a situation in which the Plan's terms granted fiduciaries "unfettered discretion whether to offer" the employer's stock.[4]  469 F. App'x 57, 60 (2d Cir. 2012) (summary order).

      Here, the Plans' stated purposes include providing employees with investments in company stock.  The 2004 PSP provides, for example, that it was established to "provide [employees] with a proprietary interest in the continued growth and prosperity of the Company. As an incentive, the Company intends to match a portion of such savings by regular contributions as provided in the Plan.  As an employee stock ownership plan, the Plan is designed to invest primarily in shares of Company common stock."[5]  See 2004 PSP, Ex. F at 1.  The Plan documents all include language providing that the company stock fund "shall" be included as an investment option, and the language of the Plans further mandates that employer contributions shall be in

---

[4]    For example, the Plan language in JP Morgan mandated that, prior to October 1, 2002, 50% of the matching contributions given by JP Morgan to participants who had not achieved certain age and service requirements would be automatically invested in the company stock fund. 469 F. App'x at 60 n. 3.

[5]    The remaining plans include similar statements of purpose.  See, e.g., 2001 PSIP, Ex. J at Art. 1 ("The purpose[] of this Plan [is to] provide [employees] with a proprietary interest in the continued growth and prosperity of the Company"); 2001 W-L Plan, Ex. H at § 1.1 ("The purpose of the [Plan] is to . . . provide an opportunity for employees eventually to become stockholders of Pfizer Inc and thus strengthen their direct interest in the progress and success of the Company and Pfizer Inc."); 2002 Pharmacia Savings Plan, Ex. L at § 1.04 ("It is intended that Plan be a qualified profit-sharing plan withing the meaning of section 401(a) of the Code with an employee stock ownership feature under section 4975(e)(7) of the Code"); 1997 Pharmacia & Upjohn Savings Plan, Ex. N at § 1.1 ("The plan is intended to qualify as a profit sharing plan under Section 401(a) of the Internal Revenue Code with . . . an employee stock ownership feature under Section 4975(e)(7) of the Code"); 1998 Monsanto Savings and Investment Plan, Ex. P at § 1.2 (The Plan "is maintained to provide eligible employees with an opportunity to acquire and hold long-term investment and ownership interests in the Corporation").

company stock.  See, e.g., 2004 PSP, Ex. F at p. 8 ("Fund(s) means the investment vehicles

designated from time to time by the Committee for the investment of contributions made to the

Plan. Fund(s) shall include: (a) the Pfizer Company Stock Fund, which invests in common stock of

Pfizer Inc."); id. at p. 10 ("Pfizer Match Fund means a fund which invests in the common stock of

the Company, in which Matching Contributions are invested"); id. at pp. 19, 23 ("Matching

Contributions shall be invested in the Pfizer Match Fund").[6]  Additionally, the Plans contain

numerous provisions that make sense only to the extent a company stock fund is offered, including

provisions relating to company stock purchases, reinvestment of dividends and voting rights.  See,

e.g., 2004 PSP, Ex. F at pp. 23 - 24 (procedures governing purchase of company stock fund

shares); id. at pp. 31 - 32 (procedures governing reinvestment of dividends from company stock

fund); id. at p. 51 (procedures governing voting rights for shares in company stock); see also

GlaxoSmithKline, 494 F. App'x at 175 (where Plans presupposed a company stock fund option in

sections governing withdrawals, exchange offers, and reinvestment of dividends, Moench

---

[6]     Similar language appears in the other Plans at issue. See, e.g., 2001 PSIP, Ex. J at
pp. 12 - 13 ("Each Member may elect upon enrollment . . . that his future Employee
Contributions and Qualified Deferred Earnings Contributions shall be invested in
one or more of the following Funds: . . . Fund C - An unsegregated fund invested
and re-invested solely in Pfizer Inc. common stock"); id. at p. 15 ("All Employer
Contributions shall be invested in a separate unsegregated fund consisting solely of
Pfizer Inc. Common stock"); 2001 W-L Plan, Ex. H at § 9.4 ("All Company
Matching Contributions shall be allocated to the Company Stock Fund"); 2002
Pharmacia Savings Plan, Ex. L at § 7.02 ("The Investment Committee shall
designate the available Investment Funds to which a Participant shall direct the
investment of amounts credited to his account; provided, however, that one such
Investment Fund shall be the Common Stock Investment Account"); 1997
Pharmacia & Upjohn Savings Plan, Ex. N at § 1.2 (providing for merger of
Employee Stock Ownership Plan into the Pharmacia & Upjohn Savings Plan); id. at
§ 5.4 ("Assets of the Pharmacia & Upjohn Stock Fund have been and shall continue
to be invested entirely in shares of common stock of Pharmacia & Upjohn, Inc . . .
."); 1998 Monsanto Savings and Investment Plan, Ex. P at § 9.2 ("The Trust Fund
shall consist of the following funds: . . . (b) A 'Corporation Stock Fund' which shall
be invested in the common stock of the Corporation"); id. at § 9.5(a) (employer
contributions "shall be invested in the Corporation Stock Fund").

presumption applied, because "were fiduciaries permitted to withdraw the [company stock fund] without restriction . . . these references to the [company stock fund] in the Plans would render the relevant provisions confusing if not incoherent").

Plaintiffs argue that the company stock fund provisions are, nonetheless, discretionary and that Defendants' actions are not protected by the presumption (or are at least subject to a less deferential standard of review), because the Plans give the fiduciaries power to eliminate the company stock fund investment option.  Such an elimination provision does not, however, preclude application of the <u>Moench</u> presumption.  <u>See, e.g.</u>, <u>GlaxoSmithKline</u>, 494 F. App'x at 175; <u>Taveras v. UBS AG</u>, 708 F.3d at 444.  In <u>Taveras</u>, the Second Circuit found that the <u>Moench</u> presumption applied to a plan that explicitly permitted the investment committee to eliminate the company stock fund as an investment option.  <u>Id.</u>  Looking to plan language providing that one of the Investment Funds "*shall* be the [UBS] Common Stock Fund," the court held that, despite the fund elimination provision, the plan sufficiently required its fiduciaries to provide plan investors the option to invest in a company stock fund so as to trigger the presumption of prudence.  <u>Id.</u> (emphasis added).

The Pfizer and Pharmacia plans at issue here include fund elimination language that is similar to the language in <u>Taveras</u>.  <u>See, e.g.</u>, 2004 PSP Trust Agreement, Ex. D at pp. 3 - 4 ("The Committee is authorized to terminate the existing Investment Funds and establish new Investment Funds").  The Plans also include language suggesting that fiduciaries have some discretion in how to invest the assets of any given fund.  <u>See, e.g.</u>, 2004 PSP, Ex. F at p. 24 ("Nothing provided herein shall prevent the Trustee or the investment adviser for any Fund from maintaining in cash or short term securities such part of the assets of each Fund as in its sole discretion it shall deem necessary or desirable to accomplish the purposes of this Plan").  As in

Taveras, however, these general provisions are insufficient to preclude application of the Moench presumption, or, as will be seen, to change the test applied for abuse of discretion.  As noted above, the Plans' stated purpose includes investment in company stock.  See Taveras, 708 F.3d at 443-44 (applying Moench presumption in part because plan's stated purpose was to "attract and retain qualified individuals by providing them with an opportunity to accumulate assets for their retirement and to acquire [UBS] Common Stock").  Given the Plans' stated purposes, the presence of language stating that a company stock fund *shall* be offered, mandates that employer contributions be in company stock, and numerous other references to company stock funds, it is clear that, considered as a whole, the Plans "strongly favor" employee investment in the Pfizer and Pharmacia Company Stock Funds and do not grant fiduciaries "unfettered discretion" whether to offer company stock.  Accordingly, the Court finds that the Moench presumption applies, that Defendants' company stock acquisition and retention decisions are entitled to a presumption of prudence, and that the exercise of the fiduciaries' discretion with respect to the acquisition and retention of Pharmacia and Pfizer stock is subject to review only for abuse of such discretion.

### The Complaint Fails to Allege Plausibly that Defendants Abused their Discretion

Once the Moench presumption applies, the fiduciary's action is subject to review for abuse of discretion.  The presumption is a "substantial shield" that precludes liability "where there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock."  Citigroup, 662 F.3d at 140 (internal quotations omitted).  As applied by this Circuit, the abuse of discretion inquiry looks to the overall economic situation of the company at the time of the challenged decision -- "fiduciaries are only required to divest an EIAP or ESOP of employer stock where the fiduciaries know or should know that the employer is in a 'dire situation.'"  McGraw-Hill, 660 F.3d at 610.

> [O]nly circumstances placing the employer in a "dire situation" that was objectively
> unforeseeable by the settlor [can] require fiduciaries to override plan terms. The test
> of prudence is . . . one of conduct rather than results, and the abuse of discretion
> standard ensures that a fiduciary's conduct cannot be second-guessed so long as it is
> reasonable.

Citigroup, 662 F.3d at 140 (internal citations omitted).

In each case in which the Second Circuit has assessed whether such "dire circumstances" were present, it has examined whether the drop in the company's stock price occurred under circumstances indicative of a near-catastrophic threat, not merely to a product line or operating division, but to the company as a whole.  See, e.g., McGraw Hill, 660 F.3d at 610 (Plaintiffs had not adequately alleged that defendants knew or should have known that McGraw-Hill was in a dire situation, when allegations related entirely to operations within only one of McGraw-Hill's three operating segments).  Although a plaintiff is not required to demonstrate the prospect of impending collapse, mere stock fluctuations, even significant downturns, are not sufficient to establish "dire circumstances" indicative of abuse of discretion in the retention of investments.  Id. at 140.  Thus, in Citigroup, the complaint was properly dismissed notwithstanding a 50% drop in the price of the company's stock and the foreseeability of tens of billions of dollars in potential losses, because such losses "would not have . . . compelled [the fiduciaries] to find that Citigroup, with a market capitalization of almost $200 billion, was in a dire situation."  Id. at 141 (citing other cases where 40%, 25% and 80% drops in share price could not rebut the presumption).  Similarly, in Fisher v. JP Morgan Chase & Co., 2012 WL1592208, at *2, the Second Circuit held that plaintiffs had not adequately alleged that defendants knew or should have known that JP Morgan was in a dire situation.  Although JP Morgan's stock price fell 55% over the course of the class period, even when it was at its lowest price of $15 per share, it still retained significant value and, "throughout the Class Period, JP Morgan remained a viable

company." Id.; see also In re Bank of America Corp. Sec., Deriv., and ERISA Litig., 756 F. Supp.

2d 330, 354-55 (S.D.N.Y. 2010) ("Although a decline in stock value of over 80% may have caused

reason for concern about the level of risk involved with continued investment in BofA common

stock . . . , Plaintiffs have not pleaded facts sufficient to establish that Plan fiduciaries should have

known that BofA was on the brink of an 'imminent collapse' such that a reasonable fiduciary could

not have believed that continued investment in BofA stock was no longer in accordance with the

settlor's intent"); In re Bear Stearns Cos. Inc. Sec., Deriv., and ERISA Litig., 763 F. Supp. 2d 423,

574 (decline in share price from $171 to under $5 per share insufficient to overcome Moench

presumption because company ultimately "did not collapse, and its stock did not become

effectively worthless") (internal quotations omitted).  Accordingly, caselaw in this Circuit is clear

that the "dire situation" standard is met only when plaintiffs allege that fiduciaries' actions

facilitating or continuing  investment in employer stock -- which, like that of any company, is

subject to fluctuations -- were so inconsistent with their fiduciary duty to provide a fund offering

some shareholder value, as to constitute an abuse of discretion.

Plaintiffs seek to overcome the presumption here with allegations that, inter alia, the

Pfizer Defendants knew or should have known that the safety concerns regarding Celebrex and

Bextra "gave rise to significant undisclosed business risks for Pfizer and . . . were critical to

Pfizer" (SAC ¶¶ 597, 598); that Pfizer's business model of relying on blockbuster drugs was under

pressure (SAC ¶ 530-52); and that Pfizer was liable for illegal off-label marketing practices,

resulting in a Department of Justice investigation and payment of a multi-billion dollar settlement.

(SAC ¶¶ 560-79.)  Allegations that defendants should have known of potential risks are

insufficient to rebut the Moench presumption.  In In re UBS AG ERISA Litig., plaintiffs failed to

overcome the presumption of prudence where their complaint merely alleged, "in conclusory

fashion, that Defendants had a general awareness of the riskiness of the UBS investment strategies that ultimately put the Company in a position where it accepted [a $60 billion bailout] from the Swiss government."  No. 08 Civ. 6696, 2011 WL 1344734, at *8 (S.D.N.Y. Mar. 24, 2011), vacated in part on other grounds by Taveras, 708 F.3d 436 (2d Cir. 2013).  The UBS court held that "such allegations fall well short of persuasive and analytically rigorous facts demonstrating an abuse of discretion."  Id.  Rather, Plaintiffs must allege facts demonstrating that the risks were of a magnitude that would render the company's economic situation dire.

Similarly, Plaintiffs' allegations that the Pfizer Defendants should have recognized the risk that Pfizer could lose large sums of money due to diminished sales and the threat of civil or criminal liability are insufficient.  Plaintiffs do not allege facts indicating that the Plan fiduciaries should have perceived that such sales losses, or prospects of civil or criminal liability, would have put the company in a dire economic situation.  See Citigroup, 662 F.3d at 140 (even if defendants could have foreseen that Citigroup would eventually lose billions of dollars, they "would not have been compelled to find that Citigroup, with a market capitalization of almost $200 billion, was in a dire situation").  In GlaxoSmithKline, plaintiffs alleged that, "over the class period, GSK suffered problems with the manufacturing, marketing, safety, and efficacy of its flagship pharmaceuticals, leading to criminal prosecutions, civil settlements, fines, and a 30% drop in share value."  494 F. App'x at 175.  The Second Circuit concluded, nonetheless, that plaintiffs had failed to overcome the presumption of prudence, noting that the "presumption of prudence does not require GSK, its employees, or its stock to have performed optimally . . . our precedent instructs that far worse prospects than those alleged here are necessary to state an ERISA prudence claim against the charged fiduciaries."  Id.  In so holding, the court noted that GlaxoSmithKline's share price had rebounded since the class period, and that the company possessed a market

capitalization of over $100 billion, and had paid dividends continuously throughout the allegedly

"dire" period.  Id.

        During the class period, Pfizer completed the multi-billion dollar acquisitions of

Warner-Lambert and Pharmacia (Pfizer 2004 Form 10-K, Defendants' Ex. 10), and saw its annual

revenues grow from $29 billion to $51 billion, and its net income grow from $3.7 billion to over

$8 billion.  (Pfizer 2002 Form 10-K, Defendants' Ex. 4; Pfizer 2006 Form 10-K, Defendants'

Ex. 5.)  In 2005, at the end of the Class Period, Pfizer had a market capitalization of over $170

billion.  (Defendants' Ex. 6.)  As in Citigroup and GlaxoSmithKline, even if the Defendants could

have anticipated the worst-case scenarios as to Celebrex and Bextra, none of the facts pleaded

demonstrates that Pfizer (or Pharmacia) would have been in a "dire situation," given Pfizer's

market capitalization and the fact that Celebrex and Bextra were only two of several 'blockbuster'

drugs contributing to Pfizer's revenue stream.  See, e.g., McGraw-Hill, 660 F.3d at 610.[7]

        Pfizer's stock price dropped 52% during the Class Period. (SAC ¶ 602).  But

"[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to

establish the requisite imprudence to rebut the [Moench] presumption."  McGraw- Hill, 660 F.3d

at 610.  Here, the 52% decline in Pfizer's stock price, while significant, "does not amount to the

sort of catastrophic decline necessary to rebut the [Moench] presumption," especially in light of

the fact that, even at its lowest, Pfizer's stock price never fell below $20 per share.  See

---

       [7]      Plaintiffs cite numerous reports where analysts downwardly revised their opinions
of Pfizer stock in response to various disclosures as to Celebrex and Bextra. Even
where these reports anticipated the worst case scenario of Celebrex's withdrawal
from the market, they came nowhere near suggesting that Pfizer's viability as a
company would be threatened.  See, e.g., Defendants' Ex. 17 (report from Goldman
Sachs noting that a Celebrex withdrawal would likely impact Pfizer's share price by
$5.25, and that performance below that level might actually present a buying
opportunity.)

McGraw-Hill, 690 F. Supp. 2d 254, 270 (S.D.N.Y. 2010).  Plaintiffs' remaining allegations -- of

the general nature of risks in the pharmaceutical industry and that Defendants were imprudent by

not making real-time decisions based on the possibility of an ultimately unrealized "parade of

horribles" -- are speculative and fail to state a plausible claim that Defendants breached their duty

of prudence.  See UBS, 2011 WL 1344734, at *9 ("[T]he duty of prudence does not require plan

fiduciaries to engage in . . . prognosticating").

　　　　　　Finally, Plaintiffs' alternative theory -- that the Pfizer Defendants breached their

duty of prudence by permitting the purchase of Pfizer stock at artificially inflated prices -- is

unavailing.  ERISA's employer stock prudence exemption applies to both the "acquisition" and the

"holding" of qualifying employer securities in an EIAP.  29 U.S.C.A. § 1104(a)(2).  The Moench

presumption is likewise equally applicable.  In Citigroup, the Second Circuit expressly held that

allegations that the company's stock price was inflated during the Class Period "cannot sufficiently

plead a fiduciary breach: that Citigroup made bad business decisions is insufficient to show that

the company was in a 'dire situation,' much less that [plan fiduciaries] knew or should have known

that the situation was dire."  662 F.3d 128 at 140-41.  Because Plaintiffs have failed to allege facts

sufficient to rebut the Moench presumption, their claims that the Pfizer Defendants violated the

duty of prudence by permitting the Plans to purchase and/or retain Pfizer stock during the Class

Period must be dismissed.[8]

---

[8]　　　　The SAC is devoid of any allegations that, prior to its 2003 acquisition by Pfizer,
Pharmacia was in a 'dire' situation. Accordingly, the allegations that the Pharmacia
Defendants were imprudent for permitting the purchase of Pharmacia stock during
the first portion of the Class Period fail entirely to state a claim.

Duty of Loyalty Claims

ERISA requires fiduciaries to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries.  28 U.S.C. § 1104(a); see also State St. Bank and Trust Co. v. Salovaara, 326 F.3d 130, 136 (2d Cir. 2003) ("This statutory duty of loyalty has been described by this Court as requiring that a fiduciary act, in Judge Friendly's felicitous phrase, with an 'eye single to the interests of the participants and beneficiaries." (citation omitted)).  The SAC alleges that various groups of defendants violated the duty of loyalty by failing to make fiduciary decisions for the exclusive benefit of the Plans and failing to obtain independent advice in situations presenting potential conflicts of interest.  The only allegedly wrongful conduct described in the SAC, however, is Defendants' decision to continue offering company stock to plan participants.  As explained above, Defendants' decision to offer company stock was entitled to a presumption of prudence, and Plaintiffs have failed to allege facts sufficient to rebut that presumption.  Accordingly, Plaintiffs' claims that Defendants breached their duty of loyalty must fail as they are derivative of Plaintiffs' unsuccessful claims that Defendants breached their duty of prudence.[9]


Derivative Claims

Plaintiffs' remaining claims -- for failure to monitor, failure to inform, failure to investigate, co-fiduciary liability and knowing participation in breaches of duty -- are similarly derivative of their claims that Defendants breached their fiduciary duty of prudence.  See, e.g., Citigroup, 662 F.3d at 145.  As Plaintiffs have failed to plead plausibly that Defendants breached

---

[9]     Plaintiffs implicitly concede this point in their opposition brief. (Opp. Br. at p. 20 n.16.)

the duty of prudence, their derivative claims are also dismissed.

CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Consolidated Second Amended Class Action Complaint is granted in full.  Pfizer and Pharmacia's separate motion to dismiss the Consolidated Second Amended Class Action Complaint is terminated as moot.

This Opinion and Order resolves docket entry nos. 188 and 189.  The Clerk of Court is requested to enter judgment dismissing the complaint and to close the following cases: 04-cv-10071, 05-cv-00735, 05-cv-01308, 05-cv-01920, 05-cv-02510, 05-cv-02874, 05-cv-06327.

SO ORDERED.

Dated:  New York, New York
       March 29, 2013

                                 _____/S_____
                                 LAURA TAYLOR SWAIN
                                 United States District Judge